Case number 20-5263, Maria A. Saunders, appellant, versus Andrew Saul, Commissioner, SSA. Ms. Benall for the appellant, Mr. Walker for the appellate. Good morning, Ms. Benall. We'll hear from you. Thank you, sir. May it please the court, my name is Tina Benall. Today I beg for justice for benefits for Mrs. Maria Saunders. We're before you today because the Social Security Administration, faced with insolvency, has lost sight of its mission. The agency believes it must save the trust fund by denying meritorious disability claims. Appropriations are the job of Congress, but Congress has given this agency the job of ensuring that Americans who are paid insurance, their disability insurance, receive that income if they in fact become disabled. And Ms. Saunders has. We also need to point out at the beginning that the Social Security Act is a remedial statute. Consequently, the benefit of the doubt belongs always to the claimant. Under the Social Security Act, a claimant only needs to show 12 months of disability. And Ms. Saunders has done that on the basis of the well-supported opinions of her treating physicians. Further, she showed that by November 2017, her clinical findings met the requirements for automatic disability under the enlisting 1.04. Counsel, can I ask you a question about the treating physician opinions? Of course. With respect to Dr. Williams, I guess, was really kind of her primary care physician, is that right? Yes, sir. A number of times, he saw her perhaps four or five times during the course of that 12-month period after her fall. And each time, he seems to say, you know, she has, you know, certain symptoms. And then he'll say at the end, she can return to work in six weeks or she can return to work on X date. Is that the equivalent of an opinion that he's saying that he believes that her symptoms will subside by that time such that she will be able to do her job? Is that the way that those opinions should be interpreted? I think that they are best interpreted because those opinions came in the context of workers' compensation. Best interpreted as, I believe that, yes, that is an opinion. I believe that she will have improved enough in six weeks, but I'm going to check. You'll notice that each time they saw her before the next period ran out, period of, I'm sorry, the period of the opinion. So that what they're doing is extending it. Okay. Well, that did confuse me because I thought that there were instances where he gave such an opinion, but he doesn't see her again until after that time period had passed. So, like when he saw her on January 29th, he says she should be unable to work at all until February the 17th. But he does not see her again before February 17th. He doesn't see her again till April the 2nd. Right. So I guess I'm just trying to understand what your view is of how the ALJ should have interpreted those opinions. Those workers' compensation opinions are, I don't want to say, this is my opinion until you hear from me again, is the way those work. Because the workers' compensation board in the District of Columbia continues to move forward, to move benefits forward and to continue to pay until they decide not to. So it's sort of checking in with the doctor. The doctor is checking in with the workers' compensation board. The workers' compensation board at the same time is also checking with other doctors. You saw Dr. Brokaw. You saw the doctor who I believe is Dr. Concepcion. But it's a rolling, we'll be in touch kind of opinion. All right. I didn't want to divert you from your argument, but I was trying to understand just how those opinions should be interpreted. You can proceed. I hope that helps. Yes. I was also concerned in terms of interpretations that perhaps I had not been entirely clear. When the ALJ found that Mrs. Saunders could return to what she called past relevant work as generally performed, she was really using some other job from the Dictionary of Occupational Titles that did not involve the major tasks Mrs. Saunders had, Saunders' actual work, and she couldn't do that. Social Security Rule 8261 specifically states the dictionary cannot be relied on for jobs it doesn't list. And as the expert himself said at hearing, he could only come sort of close. And counsel I take it that there was nothing in introduced in the record of like, like a job description that the employer had for, you know, hiring somebody into this position. There was nothing like that that was ever introduced in the record. There's Miss Saunders testimony. That's typically what's used. Okay. Again, unless there's reason to doubt it. The. So the bus monitor job was not her job, we know that the Social Security Ruling 00-04P requires the ALJ to use the actual exertional level of the occupation. There are cases, and the agency has cited some, where the ALJ can carve out tasks, if they are peculiar to an individual's specific job, such as a secretary, who's also expected to care for the boss's very active toddlers. That's not generally part of a secretary's job. So that can be carved out. In this case, however, Mrs Saunders job as she actually performed it was generally performed exactly the same way in the national economy. I think the lead case there is probably Deloach, and it specifically holds that the past relevant work used by the ALJ, past relevant work as generally performed, must include the actual tasks of the job. Deloach is interesting here too, because it also holds that a claimant may overcome any rebuttable presumption created by the dictionary by showing that the actual job was never contemplated by the compilers of the dictionary in 1991. Mrs Saunders' job was not created until 2006 under the transportation regulations of the Individuals with Disabilities Education Act. Now you argue that there was another job classification that was more like a... Healthcare attendant, sir. Yeah, that that was really kind of a more relevant job description. Yes, and it follows the OOO4P, you have to use the correct exertional level, and it follows 8261. The major tasks have to be reflected. The childcare attendant position that came from the vocational specialist at the state agency reflects both taking care of handicapped children, and getting them onto buses, helping them move around, that's very close. So, that job could be used. But of course the ALJ didn't mention it. The vocational specialist first said that the bus attendant was the closest but then you say on reconsideration. He said that the childcare attendant was the closest. Not exactly. It's two different people. Two different stages. At the first stage, at the initial stage, there is a set of doctors and a vocational specialist. And then, that, both of those decisions are reviewed on reconsideration, and it's on reconsideration that you see the vocational specialist say bus attendant, the childcare attendant, and the medical doctor there is Dr. Hamphill. But it's just two different stages. Just like the next thing that would happen is it would go to an ALJ, and there would be a vocational expert. All right, any questions from the panel? Yeah. All right, we'll give you a couple of minutes on rebuttal. Let's hear for counsel for the Commissioner, Mr. Walker. Thank you, Your Honors. May it please the Court, Johnny Walker on behalf of the Commissioner for Social Security. I would like to clarify some of the discussion that was just underway regarding at what point during the proceedings the various opinions or possible entries in the dictionary of occupational titles were introduced. So, my friend has highlighted the childcare attendant. That was introduced not by a vocational expert, by Dr. Hamphill, in considering the reconsideration of Ms. Saunders' denied claims relatively early in the proceedings. Later in the proceedings, when there was actually the hearing before the ALJ, the vocational expert, the qualified vocational expert, only introduced one possible dictionary of occupational titles entry, and that was the bus attendant position. It's also worth noting that Dr. Hamphill not only highlighted that childcare attendant title, but also a bus monitor title. And as we've explained in our brief, we think to the extent that we're going to ignore what the actual qualified vocational expert said and the substantial evidence that that gave the ALJ to reach her conclusion, which the Supreme Court has recognized in the B-Stake decision. But Dr. Hamphill, early in the proceedings, in addition to the childcare position, also described the bus monitor position, which actually we would submit much more closely describes the duties that Ms. Saunders actually performed. Riding on a bus, maintaining discipline on the bus, assisting children on and off the bus. The childcare attendant position that Ms. Saunders has highlighted involves duties far outside what the record shows Ms. Saunders actually performed. What does the record show helping kids on and off the bus means? Well, we know that Ms. Saunders testified that one of her duties were to assist wheelchair students door to door and operating the lift to get that wheelchair on the bus and that she would occasionally have to lift the wheelchair. And it was because of that that the ALJ determined that her position as she actually performed it was heavy duty. So to get a wheelchair from door to door, these aren't all motorized wheelchairs, right? She had to push wheelchairs, might have to get them up over a curb. Yes, Your Honor. And this is part of why the entry in the DOT that the vocational expert testified about at the hearing was a light duty position. And what the ALJ determined was that the position as Ms. Saunders actually performed it was a heavy duty position because of precisely the sort of work that Your Honor just highlighted. The question is what I'm trying to get at, though, is how can you do that if you can't lift more than 10 pounds? Or even or push more than lift lift 10 to 20 pounds occasionally, and they said push no more than that as well. I mean, I've had to push people around on wheelchairs, and even if you've got children, how can you do that safely so that you don't endanger the child if that's all you're capable of? Well, Your Honor, you cannot. And that's what the ALJ found, that Ms. Saunders could not perform the duties of her job as she actually performed it, which was at the heavy level. But there are two parts to this question. One is whether or not Ms. Saunders could have performed the job as she actually performed it. And the other question is whether or not she could have performed that type of job as it's generally performed in the economy. And the bus attendant position that the vocational expert identified at the hearing as it's generally performed in the economy is at the light duty. And the ALJ determined based on the medical evidence that Ms. Saunders could perform work at a light duty level. And what bus attendant jobs are there for people who wouldn't have to push somebody around? I mean, what bus attendant jobs are there in the economy for somebody who can only lift 10 to 20 pounds or push 10 to 20 pounds? Well, I mean, Your Honor, that's precisely what the... I mean, there's no obligation to identify a specific position or specific available positions. The question is just whether or not this type of work is generally performed in the economy. And what we had at the hearing was a highly qualified, qualifications unchallenged vocational expert who testified that Ms. Saunders' position fits within the entry for the bus attendant position. And that the dictionary of occupational titles established that that position is performed in the national economy at the light level and therefore could have been performed by Ms. Saunders. So for that reason, Ms. Saunders was able to perform the duties of her prior position as it's generally performed, even if not as she generally performed it. And it's important to note that this is not something that the ALJ came to on her own. There was a qualified occupational expert who testified at the hearing. And as the Supreme Court said two years ago in the B stake position decision, a testimony of a qualified occupational expert at an ALG hearing is precisely the type of substantial evidence that an ALJ is entitled to rely upon. I understand all that, but I don't know of any position like that, that anyone could be hired for. And I haven't heard you tell me where you think anybody could find such a job. Well, Your Honor, I mean, that's not part of the showing that's required. I mean, what the dictionary of occupational titles establishes is that that is the general duties of this occupation as it's generally performed and that Ms. Saunders can perform it. And if that's shown, then she's not disabled. Mr. Walker, can I ask you a question? The ALJ here, a lot of the reasoning and the opinion discusses whether a disability existed as of the time of the hearing. And I'm wondering if it was error for the ALJ not to make a specific determination about whether a disability existed at the one year mark. It was not. I mean, what Ms. Saunders was requesting was a continuous disability. And there's also ample evidence in the record that we've highlighted that there was no disability at the one year record at JA 81 to 82. Her physician clears her to return to work within days. Dr. Brokaw examined her and determined that she had no restrictions necessary since May 2014. So where someone seeks a continuous disability, the agency doesn't have to show that the disability existed at the one year mark. Is that correct? That's the required showing, but the ALJ here was considered, I mean, the required showing is 12 continuous months of disability. But certainly there's no obligation on the ALJ to specifically analyze that. She's considering the application package that Ms. Saunders has submitted, which is for continuing disability. But she does examine, she certainly examines medical records throughout the entire course of, since Ms. Saunders has fallen in January 2014 up through the hearing. I have a question about Dr., I guess it's Dr. Lieberman or Lieberman gave an opinion on, I guess he saw her on December 31st, 2014. This is at JA 204. November, I believe, your honor. Yeah, it's a little confusing. I'm just going by the date at the top of the document, but you could very well be right. And he says that I think she most likely has post-traumatic myofascial pain syndrome, which has become chronic. She is completely disabled because she cannot walk, stand, or sit for more than a brief period of time. And this condition is due to her fall in January 2014. I did not see this opinion discussed at all in the ALJ opinion. Did I miss that? Well, your honor, what the ALJ does, the ALJ discusses the opinion of each one of these doctors. There's no requirement for the ALJ to discuss each individual document in which an opinion appears. So with respect to Dr. Lieberman, the ALJ does discuss the final medical record in the record, which would be the November 2014 entry, discusses that Dr. Lieberman, this is at JA 7. She does discuss the November 2017 determination that she's permanently disabled. She explains how she's weighing Dr. Lieberman's conclusion and why she determines to give it that weight. That's a different, I guess that's a different opinion. I mean, I take your point, but I think that's a different opinion than JA 204. But I believe it's the opinion from the same record. I mean, she notes that he does find that she's it's from the November 2017 visit. She notes that he has an opinion that she's permanently disabled. She acknowledges that he's a treating source that finds the opinion vague and gives it no weight for that reason. So the ALJ certainly discusses that. At the end of the day, your honor, I mean, there are a number of different, a diverse array of opinions in this record. Some from Ms. Saunders' treating positions that are contradicted. For example, Dr. Williams, who fills out a disability certificate in September 2017, saying that Ms. Saunders can hardly lift or carry objects and can hardly stand for even an hour. The three months before that sees Ms. Saunders and notes that she is. Three months before that examines Ms. Saunders made findings that she had a normal gait, full strength, normal tone in her arms and legs, no distress, full range of motion without pain. And during two visits prior to that, two months apart, he made similar findings and specifically documented that she had, quote, no back pain. Those are at JA 297, 288 and 294. So there was a number of different opinions in this record. Some finding, some of which are consistent with the finding of disability, some of which are a finding of that Ms. Saunders could work with no restrictions. And the ALJ here reasonably cut a middle path through those and found that Ms. Saunders could work with life duties. So if there are no further questions, please affirm. Thank you. I guess, counsel, I'm trying to understand your point about J.A. 7. And you're saying that that addressed what I was talking about as far as Dr. Lieberman's opinion from 2014. That's at J.A. 204. What the ALJ mentions at J.A. 7 from Dr. Lieberman was an opinion offered by him in November 2017. Your Honor, the point that I'm trying to make is that Dr. Lieberman, I mean, he saw Ms. Saunders regularly and he largely repeats the same opinion each time that he sees her. The ALJ is not required to address each individual visit and each individual time that a medical provider articulates an opinion. What the ALJ has judiciously done here is to take the most recent medical record as of the time of the hearing, which expresses Dr. Lieberman's opinion that Ms. Saunders has been totally disabled since the time of her accident in January 2014. So Dr. Lieberman's opinion is considered. I mean, the mere fact that every medical record is not mentioned in this decision does not mean it was not considered. The opinion is what has been considered, and the ALJ has explained why she provided it the way that she did. If I may, I note that there's a similar application with respect to Ms. Saunders' argument that some of the opinions of Dr. Williams has been ignored. I mean, Your Honor noted that Dr. Williams provided these successive notes, you know, excusing Ms. Saunders from work for periods of a time. Now, the ALJ doesn't have to consider each one of those notes. The ALJ looked at a letter that Dr. Williams provided towards the end of his closer to the hearing, saying that his opinion is that Ms. Saunders was permanently disabled during that entire extended period of time. So each individual document doesn't have to be considered. The opinions are what should be considered, and the ALJ did that. All right. Any other questions? No. All right. Thank you. Ms. Banna, I think you were out of time, but we'll give you two minutes on rebuttal. Okay, fine. Thank you, first of all, much of what Mr. Walker had to say was, as usual, post hoc. I would like to address specifically, yes, there is a requirement, ma'am, that the judge actually look at, consider, articulate, if there's a serious question about a 12-month duration. And you will find it in, it's referenced in the program's operations manual system at DI 25505.030, but it's also referencing Social Security ruling 8252. Also, there's so many mistakes. Okay, major mistake number two was that Mr. Walker says that the judge does not have to address every opinion. The judge must address every opinion that conflicts with the judge's conclusion. That is in Social Security ruling 96-8P, near the end, but it's repeated in several other places. That's the most prominent one. Of course, they can be grouped, but you have to be careful with your grouping because you're talking about 2014 over there, 2017 over here, and the different timeframes, different symptoms. The expert qualifications, yes, Bistic says that experts are experts. Bistic doesn't say that they're infallible, thank goodness. And he made a mistake. He just forgot. And yes, sir, they do. They have to help children who are walking on double braces in fall. This is special needs children. Mr. Walker's confused about light work. The judge could not find this work was light. First of all, because she's using the Dictionary of Occupational Titles job that is not, obviously not, Ms. Saunders' job. Second of all, under 104-P, it specifically says you cannot take an occupation, say, at medium, and then call it light, which is exactly what happened here. Occupations are funny. The Dictionary of Occupational Titles, if you look at those, the first three digits of those ridiculously long numbers, those denote the occupation. In this case, the child care attendant that you asked about is the first three digits of 355. That means health attendant. The job designation for the bus monitor is 372, which is for security guards. All right. All right. Well, I think we have your argument. We will take the case under submission. Thank you.
judges: Wilkins, Rao, Silberman